## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Steve A. Preslicka,                              Civ. No. 07-4237 (PAM/JJK)

              Plaintiff,

v.

Commissioner of Social Security,        **REPORT AND RECOMMENDATION
                                          ON CROSS-MOTIONS FOR**
              Defendant.                  **SUMMARY JUDGMENT**

John H. Burns, Esq., 317 NW 7th St. No. 2, Wilmar, Minnesota 56201, for
Plaintiff.

Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South Fourth
Street, Minneapolis, Minnesota 55415, for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Steve A. Preslicka seeks judicial

review of the final decision of the Commissioner of Social Security

("Commissioner"), who denied Plaintiff's application for disability insurance

benefits.  This matter has been referred to the undersigned United States

Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636

and District of Minnesota Local Rule 72.1.  The parties have filed cross-motions

for summary judgment (Doc Nos. 12, 18).  For the reasons set forth below, this

Court recommends that Plaintiff's motion be granted in part in that this case

should be remanded to the Commissioner for further proceedings consistent with

this Report and Recommendation, and that Defendant's motion be denied.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff filed his application for disability insurance benefits on August 9, 2005, alleging a disability onset date of January 1, 2005, due to problems with his back, knee, neck, and wrist, as well as for his depression.  (Doc. No. 11, Tr. 109-113, 155.)  The application was denied initially and on reconsideration. (Tr. 46-51, 53-56.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge (ALJ) on November 28, 2006.  (Tr. 455.)  The ALJ issued an unfavorable decision on March 22, 2007.  (Tr. 15-34.)  Plaintiff sought review of the ALJ's decision by the Appeals Council and submitted new evidence, but the Appeals Council denied the request for review.  (Tr. 6-11.)  The ALJ's decision therefore became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

### B.    Factual Background

Plaintiff was 48 years old on the date of the hearing before the ALJ. (Tr. 461.)  His work history consisted of heavy labor—laying cable in ditches— from 1975 through 2004.  (Tr. 161.)  Plaintiff testified that he left his job laying cable when his boss refused to give him easier work, and because he and his boss were not getting along due to Plaintiff's slow performance on account of his pain.  (Tr. 472.)  After that, Plaintiff worked in a job placing tiling in farming fields for three months ending in December 2004.  (Tr. 465, 470, 472.)  He then

searched for other work, but was unable to find other employment after failing a physical. (Tr. 470.) At that point, he could no longer work because his back pain was progressively getting worse. (Tr. 471.) He also had progressive pain in his hands, wrists, and knees. (Tr. 511-14.)

Plaintiff testified that he lives alone in an apartment, and spends most of his time there, in part because he has problems with depression. (Tr. 472.) His adult daughter She visits him and helps him with chores. (Tr. 482.) Plaintiff is able to bathe and dress himself, and do some cooking and housework. (Tr. 473.) He has a neighbor who helps him with things like vacuuming, scrubbing floors, and cleaning the bathroom. (*Id.*) He has a few friends who visit him a couple of times a week. (Tr. 477.)

Plaintiff has pain in his lower back, which he describes as generally dull and deep, but occasionally he experiences sharp pain when he moves. (Tr. 485.) He stated that he is able to sit or stand for about fifteen minutes if he is medicated before he has to change position. (Tr. 484.) When medicated, he rated his pain as either a four or a six on a scale of one to ten; he rated such pain as an eight or nine when not medicated. (Tr. 485-86.) At one time, Plaintiff's medications included Effexor, Wellbutrin, Valium, Morphine, Ibuprofen, Seroquel, and Temazepam. (Tr. 167.) Plaintiff described the side effects from these medications as follows: the Morphine makes him drowsy and his sleeping pills make him "groggy" when he wakes up and give him trouble getting out of bed in the morning. (Tr. 470.)

3

Plaintiff testified that he has had social anxiety his whole life, which has gotten progressively worse over time.  (Tr. 496.)  He admitted that he has a problem with alcohol and attends AA meetings.  (Tr. 500.)  He further testified that he drank alcohol and occasionally used "street drugs" during the period of time that he was working, but such use did not interfere with his ability to work. (Tr. 502-03.)

Plaintiff testified he has trouble sleeping because he has nightmares from seeing his brother commit suicide when Plaintiff was 11 years old.  (Tr. 506-07.) He also envisions this during the day.  (*Id.*)  He has difficulty getting along with people because he is increasingly irritable.  (Tr. 510.)  Sometimes, he starts crying in public and he is not sure why this happens.  (*Id.*)

### C.   Medical Evidence

The following medical evidence establishes that Plaintiff had an extensive medical treatment for severe pain, and in the process of that medical treatment was prescribed a wide array of drugs by many treating physicians.

On October 22, 2004, Plaintiff saw Dr. Brian Tilby at Prairie Family Practice complaining of severe back pain.  (Tr. 276.)  Dr. Tilby recommended an orthopedic consultation, and he prescribed Percocet and Keflex.  (*Id.*)  Six days later, Plaintiff was treated at Renville County Hospital Emergency Room for back pain resistant to Percocet.  (Tr. 186.)  Dr. Robert Haakenson diagnosed acute lumbar disk syndrome with right sciatica.  (*Id.*)

Plaintiff saw Dr. Robert Heeter at Renville County Hospital Outreach Clinic

on November 9, 2004, and reported back pain with right leg numbness and

shooting pains.  (Tr. 184.)  X-rays were taken, which demonstrated significant

spurring with spinal stenosis at L3-4.  (*Id.*)  Plaintiff was again treated at the

Renville County Hospital Emergency Room for back pain on December 14, 2004,

by Dr. Paul Thompson.  (Tr. 183.)  Dr. Thompson prescribed Demerol for

Plaintiff's acute pain.  (*Id.*)

Plaintiff next saw Dr. Paul Buhr at Prairie Family Practice on December 18,

2004, and complained of back, neck, wrist, and elbow pain.  (Tr. 272.)  Plaintiff

was taking Tylox six or seven times a day to treat the pain, but it was not

effective.  (*Id.*)  On examination, Plaintiff exhibited "paraspinous muscle spasm",

decreased range of motion, and tenderness over the lumbar vertebra.  (*Id.*)  Dr.

Buhr prescribed enough Lorcet for one week. (Tr. 273.)

Plaintiff returned to the Renville County Hospital Emergency Room four

days later, and asked to be given another prescription of Demerol for his back

pain.  (Tr. 182.)  Dr. Thompson declined to provide the Demerol because Plaintiff

smelled of alcohol, which Dr. Thompson considered unsafe to mix with narcotics.

(*Id.*)  An MRI Plaintiff received at that time indicated

> [e]xtensive multilevel lumbar spine degenerative disc disease with
> multilevel disc bulging and disc herniation . . . .  There is associated
> multilevel spinal stenosis (moderate at L2-3 and mild at L3-4) and
> mutli-level foraminal narrowing (moderate bilaterally at L2-3,
> moderate to severe on the left at L3-4 and moderate on the right,
> moderate to severe bilaterally at L4-5, severe on the right at L5-S1
> and moderate to severe on the left.)

(Tr. 181.)  Plaintiff's X-rays indicated osteoarthritis at multiple sites.  (Tr. 270.)

Plaintiff saw Dr. Heeter again on January 4, 2005.  (Tr. 179.)  Dr. Heeter reviewed Plaintiff's MRI and recommended that he try a Medrol Dosepak for two weeks.  (*Id.*)  Dr. Heeter told Plaintiff that it was possible he would not be able to return to heavy labor if he had surgical decompression.  (*Id.*)

On January 18, 2005, Plaintiff reported dramatic improvement from his use of the Medrol Dosepak (Tr. 178), but only three days later, he was treated at the Renville County Hospital Emergency Room for severe back pain after he tried to help his friend move furniture.  (Tr. 177.)  Dr. Mark Ahlquist treated Plaintiff with Demerol and Vistaril.  (*Id.*)  Plaintiff again went to the emergency room for treatment of back pain on February 20, 2005.  (Tr. 309.)

In March 2005, Plaintiff complained that Lorcet was not relieving his low back pain and that pain disrupted his sleep.  (Tr. 264.)  He also reported that he hoped to obtain a job with benefits beginning that April so that he could arrange to have back surgery at the end of the construction season.  (*Id.*)  Dr. Haakenson wrote Plaintiff a prescription for Oxycontin the next day.  (Tr. 263.)

Dr. Paul Thompson saw Plaintiff on May 10, 2005, and noted that he walked bent over from spinal stenosis.  (Tr. 255.)  Plaintiff asked for a prescription for Demerol, but Dr. Thompson declined to provide it.  (*Id.*)  Instead Dr. Thompson prescribed Valium and Lorcet.  (Tr. 254-55.)

In June 2005, Plaintiff reported to Dr. Haakenson, that he had a new job at Golden Oval barns and hoped to work long enough to qualify for insurance so he could have back surgery.  (Tr. 252.)  Dr. Haakenson noted that Plaintiff's pain

was fairly well controlled on Lorcet and Valium, with the occasional use of

Oxycodone.  (*Id.*)  About a week after that consultation, Plaintiff returned to see

Dr. Haakenson with pain in his back and down his left leg.  (Tr. 250.)  Plaintiff

reported that he had helped build a stage over the weekend, and then tried to

help a friend with cement work but had to quit.  (*Id.*)  He took a double dose of

Morphine but reported that it did not provide relief.  (*Id.*)  Dr. Haakenson noted

that Plaintiff had thirty capsules of Morphine six days before the consultation, but

had only eight left at the time of this visit.  (*Id.*)

On July 2, 2005, Plaintiff told Dr. Buhr that he had been looking for a new

job, but otherwise planned to start working at the Golden Oval barns the next

week.  (Tr. 247.)  Plaintiff asked for a refill of medication because he lost some of

his pills.  (*Id.*)  On July 17, 2005, Plaintiff went to the emergency room with back

pain radiating down his left leg.  (Tr. 175.)  Plaintiff reported that he had been

helping a friend cut weeds—an activity that required running a weed cutter and

"mov[ing] some equipment"—when he began feeling pain down his left leg.  (*Id.*)

Dr. Thompson treated Plaintiff with Demerol and Phenergan.  (*Id.*)

Plaintiff needed a general physical examination before beginning work at

the Golden Oval barns.  (Tr. 239.)  The physical was performed by Dr. Mark

Ahlquist on July 27, 2005.  (*Id.*)  Dr. Ahlquist stated:

> [Plaintiff] has significant risk because of serious degenerative changes of
> his back including disc disease.  I think a 20 to 30 pound weight restriction
> is necessary.  His exam today was not too bad but he is on very high
> doses of strong narcotics.  I'm not sure why he accelerated to this level
> without considering surgical intervention.

(Tr. 239-40.)

On August 1, 2005, Plaintiff reported to Dr. Haakenson that he was turned down for the Golden Oval job because it required lifting forty pounds.  (Tr. 234.) Dr. Haakenson noted that Plaintiff had done some light work over the weekend, picking up trash in ditches, causing soreness made worse by bending over.  (*Id.*) That same day, Dr. Haakenson completed a "Medical Opinion" form indicating that Plaintiff would be unable to perform any employment in the foreseeable future due to chronic back pain, lumbar spondylosis with myelopathy, and osteoporosis.  (Tr. 403.)

Several days later, Plaintiff told Dr. Haakenson that he was feeling depressed because he was unable to work due to his back pain and that he was not sleeping well.  (Tr. 231.)  Dr. Haakenson referred Plaintiff to an orthopedic surgeon, Dr. Daniel Rotenberg.  (Tr. 234-35.)  Dr. Rotenberg reviewed Plaintiff's MRI, which demonstrated "multi-level foraminal narrowing with a disc herniation at L2-3."  (Tr. 307.)  Dr. Rotenberg stated, "[h]e is incapacitated by his pain and duration of these symptoms."  (*Id.*)

Plaintiff again went to the emergency room on August 11, 2005, and asked for a Demerol injection, stating that it was the only medication that relieved his pain.  (Tr. 306.)  Dr. Buhr agreed because Plaintiff appeared miserable and depressed, but explained to Plaintiff that "narcotic hypos are not a good way to treat chronic pain."  (*Id.*)

Plaintiff was referred to Dr. Richard Salib at the Institute for Low Back and Neck Care for evaluation on August 22, 2005.  (Tr. 187.)  Plaintiff reported having chronic back pain, intermittent right leg pain, and occasional left leg pain.  (*Id.*) Dr. Salib noted that Plaintiff was given a Medrol Dosepak in the last few months that had not been helpful.  (*Id.*)  Plaintiff walked with a slightly antalgic gait— meaning he limped on one side to alleviate weight-bearing pain—and his lower extremity strength, and knee and ankle reflexes were intact.  (*Id.*)  He had minimal tenderness to palpation of the lumbosacral spine, mild low back pain with forward flexion and extension, and no pain with lateral flexion and rotation. (*Id.*)  Plaintiff indicated that he wanted to avoid surgery.  (Tr. 188.)

Several days later, Plaintiff saw Dr. Haakenson and reported that Dr. Salib did not think surgery would be helpful.  (Tr. 226.)  Plaintiff stated that he could function partially with narcotics but believed he was unable to work.  (*Id.*) Dr. Haakenson recommended that Plaintiff be treated at a pain clinic.  (*Id.*)  At the end of August 2005, Plaintiff was referred to Dr. David Nerothin at MAPS Pain Clinic.  (Tr. 216.)  Plaintiff reported pain in his low- and mid-back, buttocks, and bilateral lower extremities.  (*Id.*)  He described his pain on that day as a four on a scale of one to ten, with his pain ranging between four and nine recently.  (*Id.*) Plaintiff noted some improvement in his symptoms with medication, walking, and swimming.  (*Id.*)

During the MAPS Pain Clinic consultation, Plaintiff admitted to a history of substance abuse, but stated that he stopped taking recreational drugs, with the

exception of marijuana, more than a year prior to the visit.  (Tr. 217.)  He also

described a history of depression and rheumatoid arthritis.  (*Id.*)  Plaintiff reported

that he does not work, but he helps a friend on his hobby farm.  (*Id.*)  Dr. Nerothin

reported that Plaintiff exhibited a lot of pain during the interview and examination.

(*Id.*)  He found Plaintiff to have a decent range of motion of his lumbar spine and

normal lower extremity strength, but with decreased pinwheel-prick sensations.

(Tr. 217-18.)  Dr. Nerothin stated that "[Plaintiff] definitely has very significant

[MRI]-verified multilevel lumbar degenerative disease . . . ."  (Tr. 218.)

Dr. Nerothin recommended lumbar epidural steroid injections, Amitriptyline,

Ibuprofen, icing, warm-pool physical therapy, and administration of a TENS unit.

(*Id.*)

On September 2, 2005, Dr. Mark Aaron, a state agency consultant with

Disability Determination Services ("DDS"), completed a Physical Residual

Functional Capacity Assessment based on his review of Plaintiff's social security

disability file.  (Tr. 189-96.)  He concluded that Plaintiff could occasionally lift and

carry twenty pounds, frequently lift and carry ten pounds, stand six hours in an

eight hour workday, never climb ladders, ropes or scaffolds, occasionally climb

ramps or stairs, frequently balance or kneel, and occasionally stoop, crouch or

crawl.  (Tr. 190-91.)

On September 19, 2005, Dr. Haakenson completed a second "Medical

Opinion" form regarding Plaintiff's condition.  (Tr. 404.)  He diagnosed Plaintiff

with chronic low-back pain and indicated that Plaintiff could not perform any

employment in the foreseeable future.  (*Id.*)  Dr. Haakenson noted that Plaintiff would have permanent limitations of no bending, lifting, or twisting.  (*Id.*) Dr. Haakenson also concluded that Plaintiff would still have a disabling condition if he stopped abusing drugs and alcohol.  (*Id.*)

Plaintiff underwent a psychological consultative examination with Dr. Lyle Wagner in December 2005.  (Tr. 278-83.)  Plaintiff reported that his reasons for seeking disability were depression, difficulty being around people, back pain, right knee pain, and hand pain.  (Tr. 278.)  Dr. Wagner noted Plaintiff's medications and treatments to include Ambien, Valium, Morphine, Ibuprofen, Wellbutrin, Lexapro, Amitriptyline, use of a TENS unit, and hydrotherapy. (Tr. 279.)  Plaintiff reported that he had been laid-off from his last job, contradicting an earlier statement that he had quit that job because he could not handle being around other people.  (*Id.*)  Plaintiff denied any use of illegal drugs or history of treatment for drugs or alcohol.  (*Id.*)  He reported drinking an average of a six-pack of beer each month.  (*Id.*)

Plaintiff stated that a friend takes him grocery shopping and that he cooks himself simple meals in the microwave.  (Tr. 280.)  He informed Dr. Wagner that he does his own laundry and household chores, but his apartment is not very clean.  (*Id.*)  Plaintiff told Dr. Wagner that he gets along (1) "average" with family members; (2) "generally pretty good" with friends; (3) not well with co-workers because pain makes him "angry/on edge"; and (4) well with some supervisors and poorly with others.  (*Id.*)

Dr. Wagner observed that Plaintiff appeared to be in a great deal of pain and that he frequently changed positions to relieve his pain.  (*Id.*)  Plaintiff rated his depression at a level of six or seven on a scale of one to ten.  (*Id.*)  He reported having restless interrupted sleep, a fair appetite, occasional hopelessness, and feeling irritable and angry much of the time.  (Tr. 281.)  Plaintiff also described occasional crying spells, poor energy, fatigue, social isolation, and anxiety.  (*Id.*)

Dr. Wagner noted that Plaintiff ranked only in the second percentile for a concentration/attention span task, but that he did not put forth much effort.  (*Id.*)  Dr. Wagner concluded that Plaintiff was experiencing a major depressive disorder, single episode, and moderate, without psychotic features.  (Tr. 283.)  He further concluded that Plaintiff's ability or inability to work full-time was more the result of a medical/physical problem, and his anxiety and depression were secondary to his physical problems.  (*Id.*)  Dr. Wagner assigned Plaintiff a "GAF"[1] score of 60.  (*Id.*)

Shortly after the psychological consultative examination, DDS Psychologist Dr. Owen Nelsen assessed Plaintiff's mental residual functional capacity, and

_____

[1]      "[T]he Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")).  A GAF score of 51-60 indicates moderate symptoms, a score of 41-50 indicates serious symptoms, and a score of 31-40 indicates major impairment in several areas.  DSM-IV-TR at 32.

completed a Psychiatric Review Technique Form at the request of the Social Security Administration.  (Tr. 284-301.)  Dr. Nelsen's assessment indicated that factors relevant to Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation generally revealed either no significant limitations or only moderate limitations.  (Tr. 284-86.)

On January 18, 2006, Plaintiff was referred to Andrew Johnson, a licensed therapist, who evaluated Plaintiff for individual therapy.  (Tr. 322.)  Plaintiff reported having trouble getting along with his co-workers.  (*Id.*)  Plaintiff also admitted having been in "Detox" and having received chemical dependency treatment more than once.  (Tr. 323.)  Johnson noted that Plaintiff appeared somewhat disheveled, and was obviously in discomfort at times during the evaluation.  (*Id.*)  He concluded that Plaintiff's insight and judgment were poor, and his affect was blunted.   (*Id.*)  He found Plaintiff's suicidal potential to be moderate.  (Tr. 324.)  Johnson diagnosed depressive disorder, post traumatic stress disorder, alcohol dependency, personality disorder, and a GAF score of 50.  (*Id.*)

Plaintiff underwent a psychiatric assessment with Daniel Schubert, a clinical nurse specialist and licensed psychologist at Western Mental Health Center, on February 16, 2006.  (Tr. 379.)  Plaintiff described symptoms of depression, helplessness, shamefulness, anxiety, and stress.  (*Id.*)  He acknowledged having social anxiety his whole life.  (*Id.*)  Plaintiff reported feeling tired, even when he sleeps well, poor concentration, feelings of shame and guilt,

and poor self-esteem.  (Tr. 381.)  Plaintiff admitted that he covered up depression with chemical and alcohol use.  (Tr. 379.)  Plaintiff also admitted that he drank alcohol before the consultation with Schubert so that he would be able to talk to the psychologist.  (*Id.*)  Schubert diagnosed major depression, social anxiety disorder, alcohol abuse, post traumatic stress disorder, and assigned Plaintiff a GAF score of 45-55.  (Tr. 381.)  Schubert recommended treatment with Remeron for sleep and anxiety, and continuing Valium and Wellbutrin.  (Tr. 382.)

After complaining of increased right knee pain (Tr. 359), Plaintiff had an MRI of his right knee on March 1, 2006.  (Tr. 304, 420.)  The MRI showed (1) mucoid degeneration involving the medial meniscus, with a small tear of the meniscal body; (2) chondromalacia with partial thickness cartilage loss and associated subchondral cystic change and marrow edema; and (3) a tiny Baker's cyst.  (Tr. 304.)  Dr. Thompson set up a consult for Plaintiff with Dr. Heeter for treatment of his knee.  (Tr. 357.)

The next day, Plaintiff saw Dr. Nerothin for his back pain.  (Tr. 434-36.)  Dr. Nerothin noted Plaintiff's pain correlated well with the MRI findings.  (Tr. 435.)  On physical exam, Plaintiff was alert and oriented, but he smelled of alcohol. (*Id.*)  A random urine screen was performed and returned positive for Cocaine, Morphine, Methamphetamines, Marijuana, Benzodiazepine, and Oxycodone, none of which Plaintiff admitted to taking.  (*Id.*)

Plaintiff followed-up with Schubert on March 15, 2006.  (Tr. 378.)  Plaintiff was feeling very depressed and irritable.  (*Id.*)  He worried about having a lifelong

14

addiction to painkillers because he was not a surgical candidate.  (*Id.*)  Schubert recommended discontinuing Remeron, and starting Cymbalta and Seroquel for Plaintiff's insomnia and depression.  (*Id.*)

On April 6, 2006, Plaintiff saw Dr. Nerothin and asked for a Morphine drip for his back pain.  (Tr. 437.)  Plaintiff was irritable, and swore frequently during the interview.  (Tr. 437-38.)  Dr. Nerothin declined to give Plaintiff a Morphine pump because of Plaintiff's use of a "number of illicit substances."  (Tr. 438.) Dr. Nerothin encouraged Plaintiff to follow up with a chemical dependency evaluation.  (*Id.*)  He notified Plaintiff's primary physician and psychiatrist about the drug screen.  (*Id.*)

On May 3, 2006, Plaintiff again saw Schubert.  (Tr. 377.)  Plaintiff reported that when he is around people, he gets irritated easily.  (*Id.*)  Plaintiff also complained that his pain medication kept him awake.  (*Id.*)  Schubert recommended adding the medication Temezepam for Plaintiff's insomnia.  (*Id.*)

On June 7, 2006, Plaintiff reported to Schubert that he had been clean and sober, and was trying to do some walking.  (Tr. 375.)  Schubert recommended a trial of Effexor.  (*Id.*)  About a month later, Plaintiff reported that he felt the Effexor was helping some.  (Tr. 374.)  He also reported attending physical therapy and AA.  (*Id.*)  In September 2006, Plaintiff again met with Schubert and commented that he knew he was addicted to certain unspecified drugs.  (Tr. 373.)

On November 19, 2006, Plaintiff went to the emergency room at Renville County Hospital and complained that his back pain was the worst it had ever

been despite taking long-acting morphine.  (Tr. 439.)  He was given Prednisone

and a Fentanyl patch, and showed improvement.  (Tr. 440-42.)  An MRI indicated

> [m]ultilevel degenerative disc disease with associated arthritic
> changes.  . . .  Bulging of the intervertebral discs at all levels and in
> conjunction with the arthritic changes, there is moderate to severe
> left neural foraminal stenosis at L3-4 and L4-5 as well as marked
> neural foraminal stenosis on the right at L5-S1, with moderate to
> marked stenosis on the left.  There is associated bilateral lateral
> recess narrowing and overall mild central canal narrowing at L3-4
> but without critical central canal stenosis.

(Tr. 421.)

That same month, Plaintiff's therapist, Andrew Johnson, responded in

writing to a series of questions about Plaintiff's ability to perform full-time

competitive work.  (Tr. 397-98.)  He noted that Plaintiff's mental health

impairments would (1) significantly reduce his concentration on and attention to

work tasks; (2) significantly reduce his work pace; (3) significantly reduce his

persistence in completing work tasks; (4) significantly reduce his social

functioning; and (5) in combination with his physical impairments, would cause

him to be absent from work three times, or more, per month.  (*Id.*)  He also

responded that Plaintiff would likely have increased irritability when exposed to

the usual stress of unskilled competitive work, and would likely have increased

problems in relations with work supervisors due to mental illness.[2]  (Tr. 398.)

One month later, Johnson completed a related questionnaire and

---

[2]     Although the written questionnaire to which Johnson responded asked for
a brief explanation for the bases of the answering person's opinion, all of
Johnson's responses consisted of a single word: "Yes."  (Tr. 397-98.)

explained the bases for his opinions.  (Tr. 407-08.)  He wrote: "[Plaintiff] suffers

from Major Depressive disorder which impairs memory function, concentration,

motivation, sleep, and interferes with social functioning i.e. strong tendency to

isolate self with hypersensitivity in social situations.  His condition is further

complicated by chronic pain."  (Tr. 407.)  Johnson concluded, given Plaintiff's

symptoms and the demands of full-time employment, that it is very unlikely

Plaintiff could perform any work on a full-time basis.  (Tr. 408.)

Schubert responded to the same questions.  (Tr. 399-400.)  He agreed that

Plaintiff's mental impairments were likely to significantly reduce his concentration

and attention on work tasks because Plaintiff's depression could affect

concentration and focus.  (Tr. 399.)  However, Schubert responded that Plaintiff's

physical limitations, and not his mental limitations, would be likely to significantly

reduce Plaintiff's persistence and pace in work tasks and affect his social

functioning.  (Tr. 399-400.)  Schubert agreed that Plaintiff would have increased

irritability when exposed to usual work stress, and noted that he was already

easily irritated when not working.  (Tr. 400.)  He also agreed that Plaintiff would

have difficulty, due to his mental illness, in relations with work supervisors, noting

that Plaintiff does not appear to have good conflict resolution skills.  (*Id.*)

Dr. Thompson, also responded in writing to a series of questions about

Plaintiff's physical capacity for work-related tasks.  (Tr. 409-13.)  He concluded

that Plaintiff could only stand for 15-30 minutes at a time before needing to

change position.  (*Id.*)  He further noted that Plaintiff could lift twenty pounds

occasionally, but not repetitively, and for a total of approximately one hour per shift.  (*Id.*)  In response to a question concerning Plaintiff's ability to sit and work six hours of an eight-hour work day, Dr. Thompson noted that Plaintiff needs to change position frequently—once or twice every fifteen minutes.  (*Id.*)  He opined that Plaintiff could handle objects if allowed to change position frequently or at will.  (Tr. 410.)  Considering all of Plaintiff's physical and mental impairments, Dr. Thompson concluded that Plaintiff would have difficulty with prolonged concentration and that "he can not currently keep up with a normal persistent pace for work."  (*Id.*)  Finally, Dr. Thompson noted that Plaintiff would need frequent breaks at work, or at least to frequently change positions, but even so, he would not tolerate more than three or four hours work at a time.  (*Id.*)  Dr. Thompson stated it was his medical opinion that Plaintiff is disabled and would not be able to perform meaningful full-time work.  (Tr. 411.)  He also concluded that if Plaintiff were to totally abstain from the consumption of alcohol and all street drugs, he would receive the benefit of having a clear mind, but would not be able to do unskilled, competitive work on a full-time basis because abstaining from such chemical usage would not change the condition of his back. (Tr. 413.)

### D.    Vocational Expert Testimony

Dr. William Tucker testified as a vocational expert ("VE") at the hearing before the ALJ.  (Tr. 521-27.)  The ALJ posed a hypothetical question to the VE about whether Plaintiff could perform his past relevant work if the ALJ found

Plaintiff's testimony to be fully credible.  (Tr. 523.)  The VE concluded that Plaintiff's past work and any other work would be precluded under Plaintiff's testimony.  (Tr. 523-24.)

The ALJ posed a second hypothetical question to the VE, asking whether a person could perform Plaintiff's past work or any other work, assuming a person with Plaintiff's age, education, and past work experience who had the physical and mental limitations described by the DDS physician and psychologist.  (Tr. 524.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform work such as that of a wire worker, inspector, hand packager, and laundry folder.  (Tr. 525.)

The ALJ posed a third hypothetical question, including the same mental limitations as in the second hypothetical, but further assuming a twenty-to-thirty pound lifting restriction.  (*Id.*)  The VE testified such a person could still perform the light jobs he previously identified.  (*Id.*)  In response to a question from Plaintiff's attorney, the VE testified that if the individual supposed by the third hypothetical had an additional restriction prohibiting repetitive reaching, handling or fingering, such a restriction would eliminate all of the alternative jobs the VE had previously identified.  (Tr. 526.)

### E.    The ALJ's Decision

The ALJ issued an unfavorable decision on March 22, 2007.  (Tr. 15-34.) In finding that Plaintiff was not disabled, the ALJ employed the required five-step evaluation, considering: (1) whether Plaintiff was engaged in substantial gainful

activity; (2) whether Plaintiff had a severe impairment; (3) whether Plaintiff's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Plaintiff was capable of returning to past work; and (5) whether Plaintiff could do other work existing in significant numbers in the regional or national economy.  *See* 20 C.F.R. § 404.1520(a)-(f).

At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 2005, but noted that any work activity after that date, including odd jobs, can be used as a supporting factor in determining residual functional capacity.  (Tr. 21.)  At the second step of the evaluation, the ALJ found that Plaintiff had severe impairments including the following:

> lumbar spine multilevel degenerative disc disease with associated arthritic changes, bulging of the intervertebral discs at all levels and in conjunction with the arthritic changes, with moderate to severe left neural foraminal stenosis at L3-4 and L4-5, as well as marked neural foraminal stenosis on the right at L5-S1, with moderate to marked stenosis on the left, and associated bilateral lateral recess narrowing and overall mild central canal narrowing at L3-4 but without critical central canal stenosis; right knee mucoid degeneration involving the medial meniscus with a small peripheral tear of the meniscal body extending to the inferior articular surface, chondromalacia involving the medial patellar facet with partial thickness cartilage loss and associated subchondral cystic change and marrow edema, and tiny Baker's cyst; major depression, recurrent; social anxiety disorder; alcohol abuse; and [post traumatic stress disorder].

(Tr. 21-22.)  The ALJ concluded that (1) Plaintiff has mild restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence or pace; and

(4) no episodes of decompensation.  (Tr. 22.)  The ALJ found that Plaintiff did not have a severe impairment of the hands or wrists.  (*Id.*)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four of the evaluation, the ALJ stated that he considered all of Plaintiff's symptoms and the opinion evidence in accordance with the regulations, which he later described in detail.  (Tr. 23.)  The ALJ concluded that Plaintiff's allegation of inability to perform significant work activities on a sustained basis was not fully credible in light of the entirety of the evidence.  (*Id.*)  The ALJ found Plaintiff to have a residual functional capacity to (1) lift or carry twenty pounds occasionally, ten pounds frequently; (2) stand six hours in an eight-hour day; (3) sit six hours in an eight-hour day; (4) never climb a ladder, rope or scaffold; (5) occasionally stoop, crouch, crawl or climb stairs and ramps; and (6) frequently balance and kneel.  (Tr. 32.)  With respect to mental impairment, the ALJ found Plaintiff to have the residual functional capacity to (1) concentrate on, understand, and remember routine, three- and four-step tasks; (2) tolerate brief and superficial contact with co-workers and the public; (3) tolerate the ordinary level of supervision; and (4) cope with the stress of a routine, repetitive, three- and four-step, limited-detail work setting.  (*Id.*)

Based on the testimony of the VE, the ALJ determined that Plaintiff could not perform his past relevant work.  (Tr. 33.)  At the fifth step of the evaluation

process, the ALJ relied on the VE's testimony that a person with Plaintiff's age, education, work experience, and residual functional capacity could perform unskilled light work as a wire worker, inspector, hand packager, and laundry folder.  (Tr. 33-34.)  Thus, the ALJ concluded that Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy, and is not disabled within the meaning of the Social Security Act.  (Tr. 34.)

### F.    Appeals Council Review and Additional Medical Records

Plaintiff sought review of the ALJ's decision by the Appeals Council, and submitted additional evidence for consideration.  (Tr. 5-9, 12-14.)  The new evidence was an assessment by Dr. Paul Thompson in response to written questions by Plaintiff's counsel, dated June 26, 2007.  (Tr. 5, 453-54.)  In his response, Dr. Thompson expressed doubt that Plaintiff could carry twenty pounds due to his pain from lateral stenosis compression, but that he could carry ten pounds occasionally.  (Tr. 453-54.)  Dr. Thompson further concluded that Plaintiff's MRI indicated enough spinal stenosis to prohibit any prolonged standing and sitting, and that Plaintiff would need to change positions frequently. (Tr. 454.)

## II.    STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.*  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account

whatever in the record fairly detracts from its weight.'" *Id.* (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199. The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits and supplemental security income under the Social Security Act. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national

economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

### III.   DICSUSSION

### A.   Whether the ALJ Erred in Evaluating the Physicians' Opinions.

Plaintiff's first three arguments relate to how the ALJ evaluated the various physicians' and mental health providers' opinions.  Although the ALJ is responsible for determining a claimant's residual functional capacity ("RFC") based on all of the relevant evidence, RFC is a medical question, and the ALJ is required to consider at least some supporting evidence from a medical professional.  *Masterson v. Barnhart*, 363 F.3d 731, 737-38 (8th Cir. 2004).

A treating physician's opinion is typically entitled to controlling weight if it is well-supported by "medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quotations omitted).  "The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify." Soc. Sec. Rul. 96-2p (1996), 1996 WL 374188, at *1.  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's assessment does not alone constitute substantial evidence if it

conflicts with the assessment of a treating physician." *Lehnartz v. Barnhart*, 142 F. App'x 939, 942 (8th Cir. 2005) (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999)).

If an ALJ determines not to grant controlling weight to a treating physician's opinion, such medical opinions are further evaluated under the framework described in 20 C.F.R. § 404.1527.  The ALJ should consider the following factors: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).

Plaintiff correctly points out that Dr. Mark Aaron, the DDS consultant who reviewed the record and evaluated Plaintiff's physical residual functional capacity on September 2, 2005, did not have the benefit of reviewing medical evidence of Plaintiff's right knee impairment, which was not obtained until March 1, 2006. The ALJ must "'evaluate the degree to which [the opinions of 'nonexamining sources'] consider *all* of the pertinent evidence in [a] claim . . .'" *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(3)) (alterations and emphasis in original).

Over one week before the MRI of Plaintiff's knee was taken on March 1,

2006, Plaintiff complained of increasing knee pain.[3]  (Tr. 359.)  The MRI

indicated (1) mucoid degeneration involving the medial meniscus, with a small

tear of the meniscal body; (2) chondromalacia with partial thickness cartilage loss

and associated subchondral cystic change and marrow edema; and (3) a tiny

Baker's cyst.  (Tr. 304.)  After Dr. Thompson reviewed the MRI, he set up an

appointment for Dr. Heeter to treat Plaintiff's knee.  (Tr. 357.)

Without having knowledge of Plaintiff's knee impairment, Dr. Aaron

concluded that Plaintiff could stand six hours in an eight hour day, and balance

and kneel frequently.  (Tr. 190-91.)  If Dr. Aaron had considered Plaintiff's

physical RFC with the benefit of the evidence of Plaintiff's knee impairment, his

opinion may well have been different.  The ALJ's decision discusses the review

of the medical record by DDS consultants—whose recommendations ultimately

formed the basis of the ALJ's RFC-finding for Plaintiff—and concludes that non-

examining physicians' opinions must be given probative weight if their opinions

are consistent with the record as a whole.  Dr. Aaron's opinions about Plaintiff's

physical RFC, are not consistent with the March 1, 2006 MRI results.  Therefore,

the ALJ erred in relying on Dr. Aaron's opinion because Dr. Aaron never treated

or examined Plaintiff, and did not review all of the pertinent medical evidence in

forming his opinion.  *See* 20 C.F.R. § 404.1527(d)(3).  Remand is required for

---

[3]      Specifically, Dr. Thompson's report indicates that Plaintiff informed him
that within the two-to-three-month period preceding this visit, his knee pain had
worsened and became particularly aggravated by getting into and out of a chair.
(Tr. 359.)

reconsideration of the RFC-finding in light of this error.

Plaintiff makes two additional arguments that the ALJ erred by discounting the opinions of Plaintiff's treating physicians, Dr. Haakenson and Dr. Thompson. First, Plaintiff argues the ALJ ignored important objective medical evidence that supports their opinions.  The objective evidence that Plaintiff alleges the ALJ ignored is contained in the MRI of Plaintiff's lumbar spine on December 23, 2004. (*See* Tr. at 418-19 (Ex. 23F)).  Plaintiff specifically points to findings of nerve root impingement and displacement.  The ALJ described, word for word, the reviewing physician's impression from the MRI of December 23, 2004, in his findings of Plaintiff's severe impairments.  (Tr. 27.)  Thus, the ALJ did not ignore this evidence.

Plaintiff's second argument is that the ALJ erred in granting greater weight to a non-examining physician's opinion because his treating physicians had a long term relationship with him that gave them a longitudinal view of his impairments, making their opinions superior.  This is one factor in favor of granting more weight to Plaintiff's treating physicians' opinions.

However, the ALJ did not rely solely on a non-examining physician's opinion of Plaintiff's limitations.  The ALJ also noted that Dr. Ahlquist, another of Plaintiff's treating physicians, performed a pre-employment physical examination of Plaintiff on July 27, 2005.  (Tr. 30-31, 239.)  Dr. Ahlquist opined that Plaintiff should not lift more than twenty to thirty pounds.  (Tr. 30-31, 240.)  He placed no other restrictions on Plaintiff's ability to work, although he noted concern with

Plaintiff's use of strong medications.  (Tr. 240.)  The ALJ noted that

Drs. Haakenson and Thompson did not formally test Plaintiff's residual functional

capacity.  (Tr. 30.)  In light of this fact, the ALJ gave sufficient reasons to not

grant controlling weight to Dr. Haakenson's or Dr. Thompson's opinions.

Plaintiff next challenges the ALJ's rejection of his treating mental health

providers' opinions.  Plaintiff correctly points out that the DDS psychologist,

Owen Nelson, who reviewed Plaintiff's file and evaluated Plaintiff's mental

residual functional capacity on December 22, 2005, did not have the benefit of

reviewing the opinions of Plaintiff's treating mental health providers.  (Tr. 288-

301).  Plaintiff did not begin his treatment with the licensed therapists Andrew

Johnson and Dan Schubert until 2006.  (Tr. 322, 379.)  Plaintiff points out that

these treating mental health providers assigned him GAF scores of 40-50 and

45-55, indicating that Plaintiff has a serious mental illness.  On the other hand, in

December 2005, Dr. Wagner, a consultative examiner who is not a treating

source, assessed a GAF score of 60, indicating moderate limitations from mental

illness.  (Tr. 283.)

The ALJ did not simply ignore the opinions of Plaintiff's treating mental

health providers and adopt the DDS consultant's opinion.  The ALJ gave specific

reasons for rejecting Johnson's and Schubert's opinions.  *See Lehnartz*, 142 F.

App'x at 941 (noting ALJ must give good reasons for weight given to treating

physicians' opinions).  The ALJ rejected Johnson's opinion because it was

inconsistent with Schubert's opinion.  (Tr. 31.)  Schubert concluded that it was

Plaintiff's physical impairments, not his mental impairments that would reduce

Plaintiff's persistence and pace in the workplace.  (Tr. 31, 399.)  However, the

ALJ did not credit Schubert's opinion regarding Plaintiff's physical limitations

because Schubert is a mental health practitioner who is not qualified to opine as

to Plaintiff's physical impairments.  (Tr. 32.)  Schubert's own opinions admit of

some inconsistency as well.  In Schubert's February 16, 2006 report, he

indicated that Plaintiff's mental health symptoms "do significantly impair his ability

to be productive and employable."  (Tr. 381.)  But in November that year,

Schubert indicated on a questionnaire that Plaintiff's mental health impairments

were not likely to significantly reduce his work pace in a competitive work

environment.  (*Id.* at 399.)

The ALJ found that the subjective complaints Plaintiff voiced to Schubert

were not entirely credible because Plaintiff consumed alcohol before his sessions

with Schubert on February 16, 2006, and March 2, 2006.  (Tr. 29.)  The ALJ also

cited Plaintiff's failure to take his antidepressant for five days and his

improvement after he resumed taking the medication as evidence that Plaintiff's

mental impairments improved with treatment.  (Tr. 30.)  Finally, the ALJ

disagreed with Johnson's and Schubert's opinions that Plaintiff has severe

limitations in social functioning because there is evidence in the record that

Plaintiff has friendships, good relationships with his stepchildren, and attends

support groups.  (*Id.*)  The ALJ also cited this evidence as inconsistent with

Schubert's opinion that Plaintiff would have increased irritability from work stress,

and increased problems with relationships with his supervisors.  (Tr. 32.)  The

ALJ noted that Plaintiff had adequate social functioning and the ability to deal

with the supervision required to help build a stage, move equipment, and help a

friend with farm work.  *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000)

(finding ALJ properly assessed RFC based on all relevant evidence including

evidence of claimant's daily activities that was contrary to physician's

assessment).  Thus, the ALJ provided good reasons for not granting controlling

weight to Johnson's and Schubert's opinions.

### B.    Whether the ALJ Erred in His Credibility Analysis and Determination of Plaintiff's Residual Functional Capacity.

In determining a claimant's RFC, the regulations require the ALJ to

consider how all of the claimant's impairments, including any symptoms such as

pain, cause physical and mental limitations that may affect the ability to work.  20

C.F.R. § 404.1545.  "The ALJ must determine the claimant's RFC based on all

relevant evidence, including medical records, observations of treating physicians

and others, and claimant's own descriptions of his or her limitations."  *Masterson*

*v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).

The ALJ must consider several factors when evaluating a claimant's

subjective complaints of pain, including: claimant's prior work record; and

observations by third parties and treating and examining physicians relating to

"[(1)] the claimant's daily activities; [(2)] the duration, frequency, and intensity of

pain; [(3)] precipitating and aggravating factors; [(4)] dosage, effectiveness and

side effects of medication; and [(5)] functional restrictions." *Casey v. Astrue*, 503

F.3d 687, 695 (8th Cir. 2007) (quotations omitted).  The ALJ must take each

factor into account, but does not need to discuss how each factor relates to a

claimant's credibility.  *Id.* (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.

2004).  The ALJ may discount subjective complaints when they are inconsistent

with the evidence as a whole.  *Id.* (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322

(8th Cir. 1984)).

Plaintiff challenges the ALJ's credibility analysis on the basis that the ALJ

ignored evidence of side effects from his medication.  Plaintiff cites to his

testimony at the hearing that his medications make him groggy in the morning,

cause him to fall asleep during the day on a daily basis, and cause clumsiness

and poor coordination.  (Doc. No. 11 at 8.)  The Court notes that when Dr.

Ahlquist performed a pre-employment physical examination for Plaintiff, he

expressed concern about Plaintiff's use of high doses of strong narcotics.  (Tr.

240.)

Plaintiff was treated with the following medications during the relevant time

period: Effexor, Wellbutrin, Valium, Morphine, Ibuprofen, Seroquel, and

Temezepam (Tr. 167); Demerol, Vistaril (Tr. 177); Medrol Dosepak (Tr. 179);

Amitriptyline (Tr. 218); Oxycontin (Tr. 263); Tylox (Tr. 272); Lorcet (Tr. 273);

Percocet, Keflex (Tr. 276); Ambien (Tr. 279); Remeron, Cymbalta (Tr. 378); and

Prednisone, and Fentanyl Patch (Tr. 440-42).  The ALJ addressed Plaintiff's use

of medication only to note Plaintiff's perceived drug-seeking behavior and

Plaintiff's admission that he was addicted to his medications.  The ALJ then concluded that these factors eroded the credibility of Plaintiff's subjective complaints.  (Tr. 29.)

Although drug-seeking behavior may affect a claimant's credibility if he seeks the drugs for recreational use, *see Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003), the same conclusion does not follow if a claimant develops dependence to a medication legitimately prescribed by a physician for treatment of severe pain.  Although the ALJ took note of evidence in the record that Plaintiff consumed alcohol and used other illegal drugs (*See* Tr. 28-29), the ALJ made no finding that Plaintiff's drug-seeking behavior, as it relates to prescription medications, was for recreational use as opposed to the legitimate use for relief from severe pain.

Dependence is an adverse effect of many of the medications Plaintiff was prescribed including Valium, Lorcet, Morphine, Oxycontin, Percocet, and Ambien. *See Physician's Desk Reference* 1223, 1287, 1815-17, 2818-19, 2957, 2983 (59th ed. 2005).  Most of these medications also have common side effects of drowsiness, sedation and/or fatigue.  *Id.* at 1223, 1816, 2822, 2957, 2982.) Ambien can cause difficulty with coordination.  *Id.* at 2983.  Morphine can cause changes of mood, and Ambien can cause changes in behavior and thinking.  *Id.* at1816, 2983.

The record indicates that Plaintiff was prescribed strong narcotic pain medication over a significant period of time.  The ALJ did not recognize that this

fact tends to support Plaintiff's allegation of severe pain.  *See Cox v. Apfel*, 160

F.3d 1203, 1207 (8th Cir. 1998) (questioning how claimant who had seven years

of complaints of pain, three surgeries, and a morphine pump could be found not

credible in allegation of pain).  The ALJ noted that Plaintiff's acute exacerbations

of pain improved with medication (Tr. 29), but did not discuss the fact that the

medication used to treat earlier acute exacerbations of Plaintiff's pain was an

injection of Demerol, which Dr. Buhr noted was not a good way to treat chronic

pain (Tr. 175, 177, 306).  Nor did the ALJ discuss the side effects of the drugs

accompanying the improvement of Plaintiff's following treatment of the acute

exacerbations to which the ALJ referred.  (Tr. 29; *see, e.g.*, Tr. 302, 337, 440.)

Demerol is a morphine-like drug, which can cause drug dependence and

side effects including respiratory depression, and to a lesser degree, circulatory

depression, respiratory arrest, shock, and cardiac arrest.  PDR at 2988-89.  It is

significant that Plaintiff's participation in odd jobs, which the ALJ cited as

evidence that Plaintiff's subjective complaints of pain were not credible, caused

acute exacerbations of Plaintiff's pain, which were treated with Demerol and

Morphine.  (*See* Tr. 177 (moving furniture); Tr. 175 (cutting weeds); Tr. 250

(building stage, doing cement work)).

The ALJ should have more fully developed the record on the issue of the

dosage, effectiveness, and side effects from Plaintiff's medication.  *See Bowman*

*v. Barnhart*, 310 F.3d 1080, 1084 (8th Cir. 2002) (requiring further development

of record on medication side effects even though medication controlled pain and

depression); *Cox v. Apfel*, 160 F.3d at 1209 (stating "[n]o determination regarding disability can be made without an investigation into the impact of the patient's dependence and the side effects of increasing doses of [Morphine.]"); *Ellis v. Barnhart*, 392 F.3d 988, 1000 (8th Cir. 2005) (noting that allegation of disabling pain may be discredited by evidence of minimal treatment or only occasional pain medication, but opposite is true where claimant has taken numerous medications.)  Plaintiff's use of, and possible dependence on, strong pain medication may significantly affect his residual functional capacity.  For this reason, the ALJ failed to fully and fairly develop the record, and remand is required for the ALJ to address this issue, and to make the RFC-determination consistent with that reconsideration.

If, after further development of the record regarding the dosage, effectiveness, and side effects from Plaintiff's medication, the ALJ finds that Plaintiff's residual functional capacity precludes any full-time competitive employment, the analysis does not end here.  The evidence of alcohol and drug use would require further analysis by the ALJ of whether drug addiction or alcoholism is a contributing factor material to the determination of disability.  20 C.F.R. § 404.1535.  The burden of proving that drug addiction (or alcoholism) was not a contributing factor material to the disability determination is on the claimant.  *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).  "An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the

individual is disabled." 42 U.S.C. § 423(d)(2)(C). The ALJ must consider which limitations would remain if the drug addiction terminated, and whether Plaintiff would still be disabled. *See Brueggemann v. Barnhart*, 348 F.3d 689, 694-95 (8th Cir. 2003). "Even though this task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other." *Id.* at 695.

## V.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 12) be

**GRANTED IN PART** in that this case should be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation; and

2.    Defendant's Motion for Summary Judgment (Doc. No. 18) be

**DENIED**.

Date: January 8, 2009

s/Jeffrey J. Keyes
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by January 23, 2009, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District

Court, and it is therefore not appealable to the Court of Appeals.